NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250456-U

NO. 4-25-0456

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 10, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| SEANTERRIUS O. WILLIAMS, | ) | No. 24CF1035 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Paul E. Bauer, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Presiding Justice Steigmann and Justice Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in (1) failing to order a mental evaluation before allowing defendant to represent himself at trial where no *bona fide* doubt as to his fitness existed and (2) instructing the jury on constructive possession.

¶ 2    Following a jury trial, *pro se* defendant Seanterrius O. Williams was convicted of unlawful possession of a weapon by a felon (UPWF) (720 ILCS 5/24-1.1(a) (West 2024)) and sentenced to five years in the Illinois Department of Corrections.

¶ 3    Defendant appeals, arguing (1) a *bona fide* doubt existed as to his fitness, and the trial court erroneously permitted him to represent himself at trial without first ordering a fitness evaluation and (2) the court erroneously instructed the jury on constructive possession because that theory was not addressed at trial. We affirm.

¶ 4                                I. BACKGROUND

¶ 5                        A. The Charge and Pretrial Proceedings

¶ 6       On October 31, 2024, the State charged defendant with UPWF (*id.*), alleging that on the same day, he knowingly possessed a handgun and had been previously convicted of the felony of robbery in Peoria County case No. 13-CF-658. The charge arose after an officer observed defendant, who was in the back seat of a Nissan Altima, place an object underneath the driver's seat, where a firearm was later discovered. When defendant was confronted by the police, he exited the vehicle, threw a speaker, and fled before being subdued when the police deployed a Taser.

¶ 7       Also on October 31, 2024, the trial court, the Honorable Mark Gilles presiding, held a pretrial detention hearing on the State's petition to deny defendant pretrial release. A pretrial investigation report was prepared that indicated defendant had been "diagnosed as SMI (Serious Mental Illness)" and reported having "mental health issues, bipolar, paranoia, [attention-deficit/ hyperactivity disorder (ADHD)] and depression," for which he took various medications. Defendant also reported undergoing mental health treatment in Alton, Illinois, for one month in 2018. During the pretrial detention hearing, defendant's counsel asserted that defendant was in the process of "getting Social Security Disability because of the significant mental health issues that he has." Counsel stated that defendant voluntarily took medication for his mental health concerns because he understood he needed it, and he also voluntarily attended counseling because he knew he needed help with his mental health. Counsel argued that, while a defendant's mental health issues would not normally "be an asset to an argument for release," the court should grant defendant pretrial release because he took his medication daily and met all his responsibilities.

¶ 8       The trial court granted the State's petition to deny pretrial release, and defendant began to interject. Although the court and defendant's counsel noted that he should speak to his attorney, defendant repeatedly interrupted, explaining he wanted to "talk for [him]self because this is crazy," and he was "getting lied on." The court responded that defendant would be allowed to

speak, but he "showed a complete inability to control [him]self," which only reinforced the court's decision to deny pretrial release. The court also informed defendant its order denying his pretrial release would be revisited at each subsequent hearing. Defendant then claimed no officer saw him with a gun and explained how he cared for his mother and grandmother. Thereafter, the court instructed defendant to take his medication and follow the rules at the jail, explaining that he would have an opportunity to revisit his detention at a future hearing.

¶ 9         At defendant's arraignment in December 2024, the trial court, the Honorable Sean Donahue presiding, appointed the public defender to represent defendant, who pleaded not guilty. The court set the matter for trial on January 27, 2025. Defendant then asked about a detention hearing, claiming Judge Gilles told him he "was qualified to get released." The court explained he was entitled to such a hearing at future court appearances but not at his arraignment. As it is immaterial to the issues on appeal, we have no need to comment on the accuracy of the trial court's statement.

¶ 10         On December 20, 2024, defendant filed a *pro se* document entitled "(Pretrial Hearing Summary Report) Facts & Statements." Therein, defendant claimed, *inter alia*, no officer saw him with a firearm, and because DeMichael Herring was seated in the driver's seat under which the firearm was located, the firearm was in Herring's possession. Defendant also explained he was "a mental health pacient [*sic*]," with diagnoses for "bipolar, depression, ADHD & paranoia" and claimed Judge Gilles lied about him possessing a gun when denying him pretrial release.

¶ 11         On January 16, 2025, defendant asked the trial court, the Honorable Stephen Kouri presiding, to allow him to proceed *pro se*, claiming his appointed attorney told him she "d[id]n't care if [he] was innocent, she was still going to get [him] railroaded." Defendant also stated that

due "to the lack of mental health staff, [he] ain't get on [his] medications till 11/7." After admonishing defendant that he had the right to an attorney or to represent himself, explaining the charge, and noting the possible sentence he faced, the court asked him if he understood that by representing himself, he would "be at a big disadvantage." Defendant responded he knew the law as it pertained to his case and that because he never possessed a gun, he would not be at a disadvantage. He further stated he knew how to pick a jury and would be ready for trial on January 27, 2025. The court granted defendant's request to proceed *pro se*.

¶ 12        Thereafter, defendant argued he should be released from pretrial detention because he never possessed the firearm retrieved from the Nissan, and no officer saw him with a firearm. The trial court noted defendant made "a lot of good arguments that are more appropriate at trial" and denied his request to vacate the pretrial detention order.

¶ 13                        B. Defendant's Motion to Dismiss

¶ 14        Prior to trial on January 27, 2025, defendant filed a motion to dismiss. In the motion, defendant explained he was sitting in the back seat of the Nissan behind Herring and that Herring had a gun under the driver's seat. Defendant claimed that when the officers approached the vehicle, he was reaching down, looking for his phone, but one of the officers was "Unrighteous" and lied by claiming he saw defendant pull something from his waistband and place it under the driver's seat. According to defendant, he was "mentally ill" and experienced a "paranoia attack" when instructed to put his hands up. As a result, defendant threw a speaker he was holding to the ground and ran, and the officers restrained him by tasing him and using "unnecessary force." Defendant's motion also asserted the trial court failed to admonish him before permitting him to represent himself.

¶ 15        Before proceeding with trial, the trial court, the Honorable Paul E. Bauer presiding,

addressed defendant's motion. The court noted it had "some concerns" because defendant referred to himself in his motion as a "mentally ill patient." When asked about that description, defendant explained, "I have [been a mentally ill patient] like in the past, but I still been *pro se*." He noted that he had been assessed as "severely mentally ill" in past psychiatric evaluations and had been diagnosed with paranoia, depression, and ADHD. However, defendant argued he was "no different" from "prosecutors [who] have mental illness" because he "present[ed] very well" and had taken his medication every morning and evening since November 7, 2024, which helped him feel "normal" and one "[h]undred percent." Defendant assured the court he was "still capable," "functional," and able to try his case. The court again admonished defendant he had the right to an attorney if he wanted one, and he said he understood.

¶ 16        The trial court then considered the arguments defendant raised in his motion to dismiss. While discussing the claims, defendant conceded his arguments were factual in nature and more appropriate for a jury. He understood that because he was "not in a bench trial," a factual assessment was "not up to [the court]," but "up to the 12 jurors." Accordingly, the court denied the motion to dismiss.

¶ 17        Thereafter, the trial court informed defendant about the jury selection process, the charge, and the possible penalties. During that discussion, the State again referenced the pretrial investigation report , which indicated defendant had reported he had been diagnosed with having a serious mental illness. In response, defendant affirmed he was competent to stand trial, took his medication, and understood he could be sentenced to prison if he was found guilty.

¶ 18        The trial court asked the prosecutor whether she planned to file a motion regarding defendant's fitness, and the prosecutor responded she did not. She explained she thought there was a *bona fide* doubt as to defendant's fitness based upon his (1) diagnosis for a severe mental illness,

(2) need for medication, (3) behavior in court, and (4) claims the officers involved in his arrest were "unrighteous and liars." However, she stated she had not "had too many opportunities to be with him in court" and only knew "how he's been behaving in the past." Defendant responded he was free to claim the officers were lying and noted he planned to "ask them questions just like [the prosecutor will] ask them questions." He also explained he received treatment in Alton, Illinois, for 30 days in 2018 because "they said [he] was incompetent to stand trial." However, he explained he was ultimately determined to be fit and accepted a plea agreement while represented by an attorney.

¶ 19 Thereafter, the trial court again admonished defendant about his right to counsel, leading him to acknowledge that the prosecutor "might" have an advantage over him because she was an attorney. However, defendant assured the court he was in good mental health and did not want an attorney to represent him. Defendant claimed he knew "how [a trial] works," and when asked to explain the trial process, he explained he and the State would make opening statements, the State would call witnesses who would answer questions, he would cross-examine those witnesses, he would then "plead[ ]" his case, and the parties would present closing arguments. The court again emphasized that defendant's inexperience placed him at a disadvantage against the State, but defendant stated he "underst[oo]d everything," had no questions about anything the court covered, and still wished to represent himself. The court found defendant's waiver of counsel was knowingly, voluntarily, and understandably made and accepted it.

¶ 20 C. Defendant's Trial

¶ 21 The case then proceeded to trial. Defendant gave an opening statement, in which he described his version of events. Specifically, he explained that at the time the officers approached the Nissan, he was searching for his phone and emphasized that Officer Bryson

Zolicoffer never saw him pull out a gun. He claimed he attempted to flee the scene because he was afraid of the officers, but he did not have a gun.

¶ 22 The State presented the testimony of Peoria City police officers Zolicoffer, Danny Marx, and David Buss; bodycam footage of the incident; photographs of the firearm located in the Nissan; and a certified copy of defendant's robbery conviction in Peoria County case No. 13-CF-658. The following was adduced.

¶ 23 In the afternoon of October 30, 2024, Zolicoffer and Marx were on patrol in a semi-marked police vehicle in the 600 block of South Western Avenue. They observed a white Nissan Altima parked in the parking lot of a convenience store called "Da Catch," and Zolicoffer recognized the driver as Herring, whom he knew had an active warrant for failing to appear in court. Zolicoffer pulled his vehicle in front of the Nissan, activated the lights, exited, and approached the Nissan.

¶ 24 Zolicoffer testified that as he approached the Nissan, he observed defendant in the back seat, behind Herring. (Bodycam footage also showed a third individual in the front passenger seat of the Nissan, but the officers did not appear to interact with him, and he appeared to exit the Nissan later.) Zolicoffer saw defendant "move in the direction from his waistband down underneath the seat," and he told Marx defendant was "shoving something under the seat." Marx, in turn, testified he observed Herring shoving something down his pants. Zolicoffer testified he then drew his taser and told defendant to show his hands. Defendant did so, revealing he was holding a white speaker, then got out of the vehicle. Zolicoffer tried to grab defendant's hands to control him, but defendant kept walking backward. Defendant then threw the speaker, striking Zolicoffer in the shin, and ran. Zolicoffer deployed his Taser, causing defendant to fall to the ground, and Marx placed him in handcuffs.

¶ 25    Zolicoffer and Marx testified that after defendant was handcuffed, he was aggressive, continued to resist, and screamed at them. They called for backup, and other officers arrived to help control the scene. Eventually, Marx conducted a pat-down search of defendant and placed him in the patrol vehicle. Defendant was then taken to the hospital to receive treatment for a cut he obtained on his elbow while he was resisting Zolicoffer and Marx.

¶ 26    Zolicoffer returned to Herring, who was still sitting in the driver's seat of the Nissan. He ordered Herring out of the Nissan, but Herring responded he had previously been shot in the leg, and bodycam footage showed him wearing a cast. Zolicoffer asked Herring what defendant put under the seat, and he responded he did not know and gave the officers consent to search the Nissan. Zolicoffer then checked under the driver's seat and observed a firearm under it, situated closer to the back passenger seat. Thereafter, he grabbed a walker out of the back seat, which Herring used to exit the Nissan. Zolicoffer testified he had several interactions with Herring in the past and had never known him to carry a gun.

¶ 27    While cross-examining Zolicoffer, defendant obtained Zolicoffer's admission he did not see defendant with the gun. Similarly, defendant obtained Marx's admission on cross-examination that as he approached the Nissan, he was only watching Herring and did not see defendant reaching for anything.

¶ 28    Buss testified he took photographs of the scene and collected a 9-millimeter semiautomatic handgun from the Nissan. The photographs depicted the firearm under the driver's seat, positioned closer to the rear driver's side passenger seat, with the grip pointing toward the back seat and the barrel pointing toward the passenger side of the Nissan. According to Buss, a person sitting in the front seat "would have to maneuver quite a bit to get to it." Buss testified he swabbed the firearm for DNA and checked for latent prints, but no prints suitable for processing

were recovered, and DNA swabs were not sent for analysis because a sample from defendant would be required, and analysis could have taken at least six months.

¶ 29    Defendant testified as follows on his own behalf. On the day of the incident, defendant went to "Da Catch" to purchase a white speaker from Herring, whom he claimed was a "known gang member" who carried guns for protection. When he got there, a 10-year-old boy was sitting in the passenger seat of the Nissan, holding a firearm, and defendant told him to go home. The boy then left, leaving the gun on the seat, and Herring put it in the glove compartment. Defendant claimed he knew Herring had another weapon under the driver's seat from his "own eyes" and because Herring told him. After obtaining the speaker, defendant's friend, Jonathan Tidwell, entered the Nissan, and the three of them had a conversation about the minor who left. Defendant used Herring's phone to call for a ride because his was turned off. Two police officers then approached the vehicle. Defendant claimed he never reached for anything on his hip but acknowledged his fingerprints could have been on the gun because he was searching for his phone. However, defendant also claimed he "never said once that [he] touched the gun or had it in [his] possession." Defendant exited the vehicle as the officers arrived and asked if they had a warrant. At that time, he was carrying the speaker, but he threw it "down at the ground" and ran to "get out of harm's way" because he was afraid. Defendant claimed that at that time, Tidwell "took off" with the gun Herring placed in the glove compartment.

¶ 30    Defendant presented a portion of Zolicoffer's bodycam footage not included in the State's exhibit showing a conversation he had with Zolicoffer while his elbow was treated at the hospital. During that conversation, defendant pressed Zolicoffer on whether he saw him pull out a gun—suggesting that he just saw him reaching—and a gun was found under the driver's seat of the Nissan. Zolicoffer responded that he agreed that he never saw defendant pull out a gun.

¶ 31 Zolicoffer testified in rebuttal and confirmed he never saw a gun in defendant's possession. However, he saw defendant remove "something" from his waistband as he approached the Nissan and shove it underneath the seat.

¶ 32 During closing arguments, the State argued that, while Zolicoffer never personally saw defendant pull out a firearm, the jury could nevertheless conclude he possessed one because Zolicoffer observed him placing something under the driver's seat, a firearm was found there and was positioned closer to where defendant was sitting, and defendant fled from the police. Defendant argued he never had a gun, Zolicoffer admitted he never saw him with one, and the State and the officers were lying.

¶ 33 Following argument, the trial court instructed the jury. In accordance with Illinois Pattern Jury Instructions, Criminal, No. 4.16 (approved Dec. 8, 2011) (hereinafter IPI Criminal No. 4.16), the court instructed the jury, *inter alia*, "Possession may be actual or constructive. A person has actual possession when he has immediate and exclusive control over a thing. A person has constructive possession when he lacks actual possession of a thing but he has both the power and the intention to exercise control over a thing."

¶ 34 The jury subsequently began deliberating. During its deliberations, the jury sent a note asking, "What is the deffination [*sic*] of immediate & exclusive control?" The trial court responded, "The instructions which you have been given cover all of the law applicable to the case." Thereafter, the jury found defendant guilty, and the court appointed the public defender to represent him for the remainder of the proceedings.

¶ 35 D. Posttrial Motions and Sentencing

¶ 36 Despite being represented by counsel, defendant filed several *pro se* posttrial motions between February 2025 and when his counsel filed a motion for new trial in March 2025.

- 10 -

In the *pro se* motions, defendant argued the trial court should have ordered a psychological evaluation before allowing him to proceed *pro se*, Judge Kouri failed to admonish him about his decision to proceed *pro se*, his arrest was illegal, the State tampered with the video evidence, and one of the officers sexually assaulted him while searching him. Defendant attached to one of his motions lyrics to a song he wrote, claiming he was innocent.

¶ 37 The motion for new trial filed by defendant's counsel, in turn, contended the trial court and the State erred in "failing to raise" a *bona fide* doubt as to defendant's fitness prior to trial. Counsel included documentation from defendant's prior criminal cases in Peoria County case Nos. 21-CF-598 and 18-CF-278 detailing his fitness in those matters. This documentation included forensic psychiatry and psychology center reports from January 2019 and March 2022, a June 2022 interim order for an in-person evaluation of defendant, and a June 2022 evaluation from the Illinois Department of Human Services. These documents showed that in 2019, defendant was diagnosed with bipolar I disorder, alcohol use disorder, and cannabis use disorder. He also had borderline intellectual functioning that caused him to be illogical and irrational at times, and testing suggested he had an IQ of 66. Although defendant was assessed as being unfit to stand trial in case No. 18-CF-278, the report noted that with medication, it was likely he would attain competency to stand trial within 12 months. Defendant ultimately pleaded guilty in that case to unlawful possession of a stolen motor vehicle. The documents also showed that although defendant was initially assessed as unfit in case No. 21-CF-598, he was reevaluated and assessed as fit to stand trial. In that case, he pleaded guilty to the offense of criminal damage to government supported property.

¶ 38 From March 2025 to April 2025, defendant filed additional *pro se* motions, including a "Motion to Dismiss Charge" contesting the facts of the incident as presented by the

State and reasserting that he never possessed a firearm.

¶ 39    The trial court held a hearing on counsel's motion in April 2025. Counsel asserted she visited with defendant for approximately an hour, and based on her observations of his demeanor, it was apparent to her that he "was likely suffering from some sort of mental health issue." Counsel claimed that following her review of the reports from defendant's previous cases, she believed he was "struggling with mental health issues and likely was not fit at the time of trial." Accordingly, counsel noted she believed there was a *bona fide* doubt as to defendant's fitness and requested that prior to proceeding to sentencing, he be evaluated to determine whether he was fit at the time of trial and for sentencing. She acknowledged, however, that in both of defendant's previous cases, he was assessed as being fit for trial following treatment.

¶ 40    In response, the State argued the trial court held an exhaustive discussion about defendant's mental health concerns prior to trial. During that discussion, defendant assured the court he began taking his medications in November 2024 and that his mediations made him feel "a hundred percent" and "normal." Additionally, defendant and the court discussed in detail the parts of the trial, and he "said he understood everything." The State further argued that during his trial, defendant understood "what he was doing," acted appropriately, and "presented himself fairly well," without acting out in front of the jury.

¶ 41    The trial court denied the motion for new trial filed by defendant's counsel. Defendant then informed the court he wanted to proceed on only his "Motion to Dismiss Charge," which the court ultimately denied.

¶ 42    Thereafter, the trial court sentenced defendant to five years' imprisonment.

¶ 43    This appeal followed.

¶ 44                                II. ANALYSIS

- 12 -

¶ 45    Defendant appeals, arguing (1) the trial court erred by failing to order a fitness evaluation and allowing him to represent himself at trial after the State raised a *bona fide* doubt as to his fitness and (2) the court erroneously instructed the jury on constructive possession.

¶ 46                                  A. Fitness

¶ 47    Defendant first argues the trial court erred in proceeding to trial without ordering a fitness examination after the State raised a *bona fide* doubt as to his fitness. Defendant acknowledges that he has failed to properly preserve this claim for review, but he requests review under the second prong of the plain error doctrine. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (stating that to preserve an issue for review, a party must raise the issue at trial and in a written posttrial motion).

¶ 48    The first step of plain error review is to determine whether a clear or obvious error occurred. *People v. Finlaw*, 2023 IL App (4th) 220797, ¶ 47. "The second prong of plain error review is equivalent to reviewing for structural error, requiring automatic reversal where the error serves to erode the integrity of the judicial progress and undermine the fairness of a defendant's trial." *Id.* A defendant's fitness to stand trial involves a fundamental right reviewable for second-prong plain error. *Id.*

¶ 49    The due process clause of the fourteenth amendment (U.S. Const., amend. XIV, § 1) bars the prosecution of a defendant who is unfit to stand trial. *People v. Shum*, 207 Ill. 2d 47, 57 (2003). A defendant is presumed to be fit, but that presumption is rebutted by evidence that "his mental or physical condition prevents him from understanding the nature and purpose of the proceedings against him or to assist in his defense." *Id.*; *People v. Weeks*, 393 Ill. App. 3d 1004, 1008 (2009); 725 ILCS 5/104-10 (West 2024). It is the defendant's burden to prove there is a *bona fide* doubt of his fitness. *Weeks*, 393 Ill. App. 3d at 1009. "If a *bona fide* doubt is raised

regarding a defendant's ability to understand the nature and purpose of the proceedings against him or assist in his own defense, a trial court must order a fitness hearing to determine the issue before proceeding." *Id.*

¶ 50 To determine whether a *bona fide* doubt exists, the trial court may consider a defendant's "irrational behavior, demeanor in court, and any prior medical opinion on competence to stand trial." *Id.* The court may also consider the "representations of defendant's counsel concerning the competence of his client," but such representations are not conclusive in determining whether a *bona fide* doubt exists. *People v. Eddmonds*, 143 Ill. 2d 501, 518 (1991). "The competency standard for standing trial is whether a defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." (Internal quotation marks omitted.) *Weeks*, 393 Ill. App. 3d at 1009 (quoting *Godinez v. Moran*, 509 U.S. 389, 396 (1993)). Under this fluid standard, there are " 'no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.' " *Eddmonds*, 143 Ill. 2d at 518 (quoting *Drope v. Missouri*, 421 U.S. 162, 180 (1975)). If the evidence before the court raises a *bona fide* doubt as to the defendant's competency, due process requires the court to *sua sponte* order a competency hearing. *Weeks*, 393 Ill. App. 3d at 1009. Whether a *bona fide* doubt exists is reviewed for an abuse of discretion. *Id.*; see *Finlaw*, 2023 IL App (4th) 220797, ¶ 57 ("[A] trial court's decision whether there is a *bona fide* doubt about fitness sufficient to trigger a hearing is reviewed under the abuse of discretion standard.").

¶ 51 Here, defendant contends the State's and trial court's concerns over his mental state confirmed the existence of a *bona fide* doubt as to his fitness and, despite that, the court failed to

order a fitness evaluation. He emphasizes the court was apprised as early as his pretrial detention hearing that he had a mental illness and took medication to address it, and documents included in his counsel's motion for a new trial showed he had previously been assessed as unfit. Additionally, he emphasizes that his behavior throughout the proceedings—including accusing his initial attorney of working against his interests, making repeated interruptions when appearing in court, and filing multiple posttrial motions despite being represented by new counsel—evidenced his lack of fitness.

¶ 52          In making these arguments, defendant relies on *People v. Ellis*, 2024 IL App (4th) 231540-U. In *Ellis*, the defendant suffered from physical and mental health issues, including seizures, strokes, severe anxiety, and post-traumatic stress disorder, and her statements and behavior raised clear concerns that she suffered from mental and physical barriers to her ability to understand the proceedings. *Id.* ¶¶ 6-7, 47. For example, the defendant repeatedly informed the trial court she was unable to communicate and confer with her counsel because, *inter alia*, she had difficulty understanding oral communication. *Id.* ¶¶ 15, 17, 47. That sentiment was repeatedly reiterated by her appointed and retained counsel, who told the court they were having significant issues communicating with the defendant because she was " 'melting down' " and had anxiety that was beyond what counsel had ever seen before. *Id.* ¶¶ 12, 15-16, 48. Both attorneys also informed the court that the defendant was having difficulty taking in information and was unable to comprehend the proceedings. *Id.* ¶¶ 8, 18. The court found no *bona fide* doubt existed about defendant's fitness, and she was convicted following a trial. *Id.* ¶¶ 18, 30. This court, however, concluded the trial court erred in making that finding because the statements of the defendant and her counsel raised a *bona fide* doubt about her ability to understand the proceedings and assist in her defense. *Id.* ¶ 50.

¶ 53        *Ellis* is distinguishable. In *Ellis*, the defendant suffered from severe physical and mental health issues that prevented her from communicating with her counsel and understanding the proceedings against her. Those issues were explicitly and repeatedly communicated to the trial court, but the court nevertheless found there was no *bona fide* doubt as to her fitness, which constituted an abuse of its discretion. By contrast, the record here confirms that, although defendant had mental health concerns, they did not prevent him from comprehending the criminal proceedings against him or aiding in his defense.

¶ 54        Based upon our review of the record, nothing defendant points to in this case created a *bona fide* doubt of his fitness to stand trial. Initially, to the extent defendant argues the State raised a *bona fide* doubt as to his fitness by commenting on his mental illness and behavior in court, that argument is unpersuasive. While "any party may raise the issue of a defendant's fitness to stand trial at an appropriate time," the determination of "[w]hether a *bona fide* doubt of the defendant's fitness exists is a matter within the trial court's discretion." *People v. Nichols*, 2012 IL App (4th) 110519, ¶ 31. Notably, the prosecutor explicitly stated she ultimately did *not* plan to file a motion raising the issue, conceding she did not have "many opportunities to be with him in court." The trial court, in turn, never made a finding that a *bona fide* doubt existed as to defendant's fitness, and as we explain in further detail below, the record reveals no abuse of discretion in reaching that conclusion.

¶ 55        Further, while the pretrial investigation report and documents attached to his posttrial counsel's motion for a new trial indicated that defendant had a serious mental illness and had reported having mental health issues, bipolar I disorder, paranoia, ADHD, and depression, these assertions alone do not necessarily establish that he was unfit. See *People v. Harris*, 206 Ill. 2d 293, 305 (2002) (noting that the defendant's mental impairment alone does not itself establish

unfitness). A defendant's fitness " 'speaks only to a person's ability to function within the context of a trial. It does not refer to sanity or competence in other areas.' " *Id.* (quoting *People v. Easley*, 192 Ill. 2d 307, 320 (2000)). To that point, even when defendant's mental health concerns were explicitly addressed by his counsel at his pretrial detention hearing, neither he nor his attorney claimed those concerns prohibited him from understanding the proceedings. Indeed, counsel argued defendant's management of his mental health through medication and treatment was a positive factor warranting pretrial release because he continued to meet all his medical and familial responsibilities. Defendant did not contest the positive characterization of his condition or claim his mental illness would prevent him from assisting in his defense. Further, while posttrial counsel highlighted defendant had been assessed as unfit in two prior criminal cases, counsel admitted that he had subsequently been assessed as fit following treatment.

¶ 56    When assessing fitness, "[t]he issue is whether defendant could understand the proceedings and cooperate with counsel." *Id.* Although defendant maintains his unfitness was evidenced by his behaviors of repeatedly interrupting the trial court throughout the proceedings, opting to proceed *pro se* because he did not believe his attorney was acting in his best interest, stating he was well informed about the applicable law, and repeatedly filing duplicative posttrial motions despite being appointed counsel, none of these behaviors support a finding that a *bona fide* doubt as to defendant's fitness existed here.

¶ 57    We find *Nichols* instructive. In *Nichols*, this court rejected the defendant's argument that the trial court erred in failing to order a fitness hearing in response to "incoherent and delusional statements [the] defendant made and his treatment during [the] proceedings for schizophrenia." *Nichols*, 2012 IL App (4th) 110519, ¶ 2. The record showed that the defendant had been diagnosed with schizophrenia, took psychotropic medications, and had been housed in

the prison's mental health unit during the proceedings. *Id.* ¶ 23. A mental health diagnostic and treatment note that was prepared around the time of the defendant's trial stated his "thought process [was] at times loose, at time[s] making statements like London family," and indicated poor insight and possible auditory hallucinations. (Internal quotation marks omitted.) *Id.* Even so, the defendant chose to represent himself at his jury trial for aggravated battery. *Id.* ¶ 6. The defendant filed a series of *pro se* documents that unartfully claimed in run-on sentences and through use of legalese non sequiturs that the State could not show the victim suffered bodily harm even though he was charged with causing contact of a provoking or insulting nature. *Id.* ¶¶ 4, 7. At one point during trial, while the defendant was requesting to admit certain evidence, the court reporter interrupted, stating, " 'I am not understanding him,' " and the court remarked, " 'I will show the defendant is not making much sense here.' " *Id.* ¶ 18.

¶ 58        On appeal, we determined that, "notwithstanding some evidence suggesting he was being held in the prison's mental health unit and treated for schizophrenia, no *bona fide* doubt of [the] defendant's fitness *** arose during these proceedings." *Id.* ¶ 38. We reasoned that nothing in the record "indicate[d] that [the] defendant's schizophrenia manifested during trial or sentencing or impaired [his] capacity for understanding the nature of the proceedings against him or his ability to present his defense." *Id.* ¶ 33. Instead, the defendant's manner of representing himself merely showed he had a lack of training and practice in the law, resulting in "flaws in his defense [that] were a risk inherent in his decision to forgo representation by appointed counsel." *Id.* ¶ 34. The defendant nevertheless demonstrated that he "understood what was at stake and took measures to present an ultimately unsuccessful—but, evidently, reasoned—defense." *Id.* ¶ 35.

¶ 59        Here, like *Nichols*, the record clearly illustrates that defendant understood the nature and purpose of the proceedings, and any flaws relating to his representation of himself

amounted to a lack of legal training, not to any manifestation of his mental health issues. For example, when prompted by the trial court to describe his understanding of the trial process, defendant capably explained the proper sequence of the parties' opening statements, the State's presentation of evidence (including his right to cross-examine witnesses), the defendant's presentation of evidence, and closing arguments. During trial, defendant gave his version of the events in his opening statement, including that Zolicoffer never saw him with a firearm. While cross-examining Zolicoffer, defendant successfully elicited the officer's admission that he never saw defendant pull out a gun. Similarly, defendant was able to obtain Meeks's admission that he did not see him pull anything from his waist. Defendant also successfully argued for the introduction of bodycam footage in which Zolicoffer stated he did not see him with a gun. During closing argument, defendant referenced those admissions as evidence supporting his theory that he never possessed a firearm.

¶ 60        To be sure, the record in this case demonstrates defendant's history of serious mental illness. However, it contains no indication that he was, at the time of his trial, suffering symptoms of mental illness that made him unable to understand the nature and purpose of the proceedings or assist in his defense. While parts of defendant's representation of himself were artless—for example, repeatedly interrupting the trial court, raising predominantly factual arguments in his motion to dismiss, or filing multiple *pro se* posttrial motions referencing similar arguments—those instances merely "betrayed a lack of training and practice in the law." *Id.* ¶ 34. The record demonstrates, however, that defendant was able to clearly communicate with the court, had a firm understanding of the nature and purpose of the proceedings, comprehended the charge and possible sentence, and capably presented a reasoned, albeit unsuccessful, defense.

¶ 61        Notwithstanding some evidence defendant experienced mental health concerns, no

- 19 -

*bona fide* doubt of his fitness arose during these proceedings. Accordingly, we conclude the trial court did not err in failing to order a fitness evaluation. Because we conclude the court committed no error, there can be no plain error. *People v. Dillard*, 2025 IL App (4th) 230739, ¶ 124.

¶ 62                                B. Jury Instructions

¶ 63        Defendant argues the trial court erred in instructing the jury as to constructive possession because the State's theory was that he actually possessed the firearm retrieved from the Nissan. Defendant contends that by instructing the jury on constructive possession, the court introduced a new theory of guilt, denying him a fair trial. The State responds that the instruction was proper because there was evidence presented that allowed the court to conclude a constructive possession issue existed.

¶ 64        Defendant again acknowledges he did not preserve this claim. See *People v. Herron*, 215 Ill. 2d 167, 175 (2005) ("Generally, a defendant forfeits review of any putative jury instruction error if the defendant does not object to the instruction or offer an alternative instruction at trial and does not raise the instruction issue in a posttrial motion."). He attributes his failure to preserve the issue to the trial court's purported failure to hold an instructions conference, for which he contends "there is no evidence" of one having occurred. Although no transcript of a jury instruction conference appears in the record, the court's January 28, 2025, trial order indicates the court held one. Defendant does not address that portion of the order, and he does not directly claim the court erred in failing to hold an instructions conference; he argues only that the purported failure to hold a conference explains why he failed to object to the inclusion of a constructive-possession instruction. To that end, we accept defendant's concession that he did not preserve his claim the court erred in instructing the jury on constructive possession but do not consider whether the court erred in failing to hold an instructions conference.

¶ 65        Notwithstanding defendant's failure to preserve the jury instruction issue, he requests that we review it, asserting the purported error here is the kind of serious error that is reviewable under Illinois Supreme Court Rule 451(c) (eff. Apr. 8, 2013). This rule provides "substantial defects are not waived by failure to make timely objections thereto if the interests of justice require." *Id.* Rule 451(c) creates a limited exception to the forfeiture rule to correct grave errors and errors in cases where the facts are so close that fundamental fairness requires that the jury be properly instructed. *Herron*, 215 Ill. 2d at 175. Because Rule 451(c) is coextensive with the plain error clause of Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967), we construe them identically. *Herron*, 215 Ill. 2d at 175. Rule 615(a) provides, "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 451(c) (eff. Jan. 1, 1967).

¶ 66        Under the plain error doctrine, unpreserved error may be reviewed when either (1) the evidence is close, regardless of the seriousness of the error or (2) the error is serious, regardless of the closeness of the evidence. *Herron*, 215 Ill. 2d at 186-87. Under first-prong plain error, the defendant "must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him." *Id.* at 187. Under second-prong plain error, "the defendant must prove there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Id.* Prejudice under the second prong is presumed due to the importance of the right involved, regardless of the strength of the evidence. *Id.* As we previously explained, plain error review requires us to first determine whether a clear or obvious error occurred. *Finlaw*, 2023 IL App (4th) 220797, ¶ 47.

¶ 67　　　　　　Here, defendant argues the "sole" theory of guilt advanced at trial was that he had actual possession of the firearm in that he "initially had the gun on his person." Defendant asserts there was no evidence or argument presented concerning constructive possession, and therefore, the trial court improperly instructed the jury on constructive possession. This argument is unpersuasive.

¶ 68　　　　　　Jury instructions "convey the legal rules applicable to the evidence presented at trial and thus guide the jury's deliberations toward a proper verdict." *People v. Mohr*, 228 Ill. 2d 53, 65 (2008). "There must be some evidence in the record to justify an instruction, and it is within the trial court's discretion to determine which issues are raised by the evidence and whether an instruction should be given." *Id.* Even "[v]ery slight evidence upon a given theory of a case will justify the giving of an instruction." *People v. Jones*, 175 Ill. 2d 126, 132 (1997). If an instruction is not supported by either the evidence or the law, it should not be given. *Mohr*, 228 Ill. 2d at 65. Our task on review is to assess whether the instructions, when considered in their entirety, fully and fairly announce the law applicable to the State's and defendant's theories. *Id.* We review the court's decision whether to give an instruction for an abuse of discretion. *Id.* at 66. In this context, an abuse of discretion occurs if the jury instructions are not clear enough to avoid misleading the jury. *Id.*

¶ 69　　　　　　Here, the State charged defendant with UPWF. To prove defendant guilty of UPWF, the State had to establish that he (1) knowingly possessed on or about his person any firearm and (2) had been convicted of a felony. 720 ILCS 5/24-1.1(a) (West 2024). "Possession" may be actual or constructive. *People v. Wise*, 2021 IL 125392, ¶ 24. Actual possession is established by evidence that the defendant exercised some dominion over the contraband. *People v. Anderson*, 2018 IL App (4th) 160037, ¶ 31. Dominion encompasses such circumstances as

- 22 -

where the defendant had the contraband on his body, he tried to conceal it, or he was seen throwing it away. *Id.* Constructive possession can be established where the State proves the defendant knew the handgun was present and exercised immediate and exclusive control over the area where the handgun was found. *Id.* ¶ 32.

¶ 70        The committee note for IPI Criminal No. 4.16 provides the definitions of actual and constructive possession are generally unnecessary where "there is no evidence that the possession was either constructive or joint, as, for example, when the substance or object was found on the defendant's person." Illinois Pattern Jury Instructions, Criminal, No. 4.16 (Committee Note) (approved Dec. 8, 2011). The committee note further states that portion of the instruction is given "only when there is an issue as to whether the defendant was in constructive possession." *Id.*

¶ 71        We find *People v. Cole*, 2023 IL App (4th) 220422-U, instructive. In *Cole*, the defendant was charged with UPWF after officers entered an apartment he was in and located a firearm underneath the seat in which he was sitting. *Id.* ¶ 7. One of the officers testified that a man asked her and other officers to enter his apartment. *Id.* Upon entering it, the officer observed a gun on a side table next to where the defendant was sitting before the defendant grabbed it and tucked it underneath his seat. *Id.* However, another officer testified when he entered, his attention was not exclusively on the defendant, and he did not observe the defendant touch a gun. *Id.* ¶ 8. The officers also testified that as the defendant was arrested, he yelled that he wanted to batter the resident of the apartment. *Id.* The defendant testified the gun did not belong to him, and he never saw or touched it. *Id.* ¶ 10. During the instructions conference, the State requested IPI Criminal No. 4.16 be given, but the defendant objected on the basis neither party alleged constructive possession was at issue. *Id.* ¶ 13. The trial court allowed the instruction, determining joint possession could be an issue because there was evidence there were two people in the apartment, and the defendant was

subsequently convicted. *Id.* ¶¶ 13-14.

¶ 72    This court affirmed the defendant's conviction, concluding, *inter alia*, no meritorious argument could be raised the trial court abused its discretion in giving the instruction. *Id.* ¶ 39. We explained that while the State's theory was that the defendant actually possessed the firearm, evidence that two people were in the apartment raised issues of joint possession. *Id.* Additionally, even if the jury believed the defendant's testimony that he did not touch the gun, they could have found he constructively possessed it because there was evidence it was recovered under where he had been sitting, and his comments while being arrested could be interpreted as consciousness of guilt. *Id.* We determined that in light of such evidence, which supported a constructive possession theory, the court was within its discretion to give IPI Criminal No. 4.16. *Id.*

¶ 73    Like *Cole*, we conclude the trial court acted within its discretion in giving IPI Criminal No. 4.16 because there was evidence to support a constructive possession theory. The evidence at trial established that at the time Zolicoffer and Marx approached the Nissan, Zolicoffer observed defendant place something under the driver's seat. Following a search of the Nissan, officers recovered the firearm, and evidence was adduced it was positioned closer to where defendant was sitting, with the grip pointed toward him. Evidence was also adduced that it would have been difficult for Herring, who was wearing a cast and needed a walker to move, to maneuver to reach the firearm. Additionally, evidence that defendant fled the scene after exiting the vehicle could be interpreted as consciousness of guilt. Given the foregoing, while the State's theory at trial focused on actual possession, there was evidence that would have allowed the jury to find he constructively possessed the firearm since it was located near and accessible to defendant. Accordingly, because there was some evidence in the record to support giving IPI Criminal No.

4.16, the court did not abuse its discretion in giving it.

¶ 74 Because we conclude the trial court did not err in giving IPI Criminal No. 4.16, there can be no plain error. *Dillard*, 2025 IL App (4th) 230739, ¶ 124. Accordingly, defendant is entitled to no relief.

¶ 75                                    III. CONCLUSION

¶ 76 For the reasons stated, we affirm the trial court's judgment.

¶ 77 Affirmed.